# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

In the Matter of the Search of
(name, address or brief description of person or property to be searched)

**WORKSPACE OF MICHAEL J. MATHERON, LOCATED WITHIN LIBRARY OF CONGRESS, 101 INDEPENDENCE AVENUE, SE, WASHINGTON, DC, JAMES MADISON BUILDING, 2nd FLOOR, ROOM 227**

## APPLICATION AND AFFIDAVIT
## FOR SEARCH WARRANT

**CASE NUMBER:**

I, <u>Donya Jackson</u>, being duly sworn depose and say:

I am a(n) <u>Special Agent with the Library of Congress Office of the Inspector General</u> and have reason to believe that
Official Title

☐ on the person or ☒ on the

property or premises known as (name, description and or location)

**WORKSPACE OF MICHAEL J. MATHERON, LOCATED WITHIN LIBRARY OF CONGRESS, 101 INDEPENDENCE AVENUE, SE, WASHINGTON, DC, JAMES MADISON BUILDING, 2nd FLOOR, ROOM 227**
**which workspace are further described in the affidavit attached hereto and incorporated herein**

in the District of Columbia there is now concealed a certain person or property, namely (describe the person or property)

**See Attachment A**

which are (give alleged grounds for search and seizure under Rule 41(b) of the Federal Rules of Criminal Procedure)
evidence, fruits and instrumentalities of alleged crime(s)

in violation of Title 18 United States Code, Sections 2252A.  The facts to support the issuance of a Search Warrant are as follows:

**See attached Affidavit**

Continued on the attached sheet and made a part hereof.  ☒ Yes  ☐ No

<u>Donya Jackson</u>
Library of Congress
Affiant

Sworn to before me, and subscribed in my presence

_____ at Washington, D.C.
Date

_____
United States Magistrate Judge

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN THE MATTER OF THE APPLICATION : | |
| OF THE UNITED STATES OF AMERICA : | |
| FOR A SEARCH WARRANT FOR THE : | **Misc. Case No.** |
| WORKSPACE OF MICHAEL J. MATHERON, : | |
| LOCATED WITHIN LIBRARY OF CONGRESS,: | |
| xxx INDEPENDENCE AVENUE, SE : | |
| WASHINGTON, DC, JAMES MADISON : | **Under Seal** |
| BUILDING, 2nd FLOOR, ROOM xxx. : | |

### AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

1.  Your affiant in this matter, Donya Jackson, has been a Special Agent with the Office of the Inspector General at the Library of Congress since May, 2007. Prior to her employment with the Library of Congress, your affiant was a Special Agent with the United States Secret Service since 2000.  During your affiant's six year tenure with the U.S. Secret Service, she was assigned to the Criminal Investigation Division in Head Quarters, and the New York Electronic Crimes Task Force based out of the New York Field Office, Brooklyn NY. Your affiant has received training in the following subject areas: Basic Investigator Course, Interview and Interrogation, Undercover Computer Investigation techniques, SEARCH High Tech Crimes Investigations of Computer Crimes Course, Investigation of Online Child Exploitation course, and Search and Seizure of Electronic Evidence techniques. Your affiant has made numerous arrests and interviewed numerous victims, witnesses, and suspects.

2.  Your affiant has participated in numerous online child exploitation investigations, and undercover online investigations.

3. Your affiant respectfully submits this affidavit in support of an application for a warrant to search the workspace of Michael J. Matheron located in the Library of Congress, 101 Independence Avenue, SE, Washington, DC, James Madison Building, 2nd floor, room 227, which has three walls, an open doorway, and light brown carpet.  Within the three walls is a desk, a red chair, bookshelves, and a file cabinet.  On the file cabinet is a  name placard reading Michael J. Matheron. ("WORKSPACE").  There is a rattan screen which is sometimes blocking the open doorway.  For the reasons set forth in this affidavit, there is probable cause to believe that there is located within these workspace evidence, fruits, and instrumentalities of violations of 18 U.S. Code Sections 2252A.

## FACTS AND CIRCUMSTANCES

4.   The statements in this affidavit are based on my personal investigation and on information provided by other law enforcement agents including Special Agent Pamela Hawe, of the Library of Congress Office of the Inspector General and on my experience and background as a Special Agent. Since this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation.  I have set forth only the facts that I believe are necessary to establish probable cause to believe that evidence, fruits, and instrumentalities of the

violations of Title 18, United States Code, Section 2252A (possession of child pornography) are presently located at the WORKSPACE.

5.   This affidavit is organized as follows:  Paragraphs 6 and 7 provide relevant statutory authority.  Paragraph 8 provides definitions of terms used throughout the balance of this Affidavit.  Paragraphs 9 through 11 provide background information concerning the use of computers and the internet generally and with respect to child pornography.  Paragraphs 12 through 18 discuss the characteristics of collectors of child pornography.  Paragraphs 19 through 26 discuss this investigation and the factual basis for my opinion that there is probable cause to believe that evidence of possession of child pornography is located on  the WORKSPACE.  Paragraphs 29 through 39 request permission to search the WORKSPACE and describe the methods of that search.

## STATUTORY AUTHORITY

6.   This investigation concerns alleged violations of Title 18, United States Code, Section 2252A(a)(1) - certain activities relating to material constituting or containing child pornography.

7.   The relevant statutory text for purposes of this Affidavit is:

a.   Title 18, United States Code, Section

2252A(a)5)(B) states:

> Any person who knowingly possesses any book, magazine, periodical, film, videotape, computer disk, or any other material that contains an image of child pornography that has been mailed, or shipped or transported in interstate or foreign commerce by any means, including by computer; . . . shall be punished as provided in subsection (b).

b.   Title 18, United States Code, Section 2256(2)(A)

defines "sexually explicit conduct," as "actual or simulated":

(i)   sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex;
(ii)  bestiality;
(iii) masturbation;
(iv)  sadistic or masochistic abuse; or
(v)   lascivious exhibition of the genitals or pubic area of any person.

c.   Title 18, United States Code, Section 2256(8)

defines "child pornography" as

any visual depiction, including any photograph, film, video, picture, or computer or computer-generated image or picture, whether made or produced by electronic, mechanical, or other means, of sexually explicit conduct, where--

(A) the production of such visual depiction involves the use of a minor engaging in sexually explicit conduct;

(B) such visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaging in sexually explicit conduct; or

(C) such visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaging in sexually explicit conduct.

-4-

## DEFINITIONS

8.    The following terms have the indicated meaning in this affidavit:

a.    The term "minor," "sexually explicit conduct," and "visual depiction," as used herein, are defined as set forth in Title 18, United States Code, Section 2256.

b.    The term "child pornography," as used herein, is defined as set forth in Title 18, United States Code, Section 8, and means any visual depiction of a minor involved in "sexually explicit conduct" as that term is defined in Title 18, United States Code, Sections 2256(8)(A) and (C).

c.    The term "computer," as used herein, is defined as set forth in Title 18, United States Code, Section 1030(e)(1).

d.    The terms "records," "documents," and "materials" include all information recorded in any form, visual or aural, and by any means, whether in handmade form (including, but not limited to, writings, drawings, paintings), photographic form (including, but not limited to, microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, photocopies), mechanical form (including, but not limited to, phonograph records, printing, typing) or electrical, electronic or magnetic form (including, but not limited to, tape recordings, cassettes, compact discs, electronic or magnetic storage devices

such as floppy diskettes, hard disks, CD-ROMs, digital video
disks (DVDs), cell phones, Personal Digital Assistants (PDAs),
Multi Media Cards (MMCs), memory sticks, optical disks, printer
buffers, smart cards, memory calculators, electronic dialers,
Bemoulli drives, or electronic notebooks, as well as digital data
files and printouts or readouts from any magnetic, electrical or
electronic storage device).

## USE OF COMPUTERS WITH CHILD PORNOGRAPHY

9.    I have received training in computer crime
investigation.  I also own a computer and use computers in the
course of my work in law enforcement and have personal knowledge
regarding the operation of computers.  Based on this training,
experience, and information provided to me by other law
enforcement personnel involved in this investigation, I know the
following:

a.    The Internet is a global network which allows
for the sharing of data across computers attached to the network.

b.    Individual users typically access the
Internet through a local Internet Service Provider ("ISP")(such
as "Yahoo") through a modem or other connection device, such as a
cable or Digital Subscriber Line ("DSL").  When accessing the
Internet, the ISP will assign each user an Internet Protocol
("IP") address, a unique number used by a computer to access the
Internet. IP addresses can be dynamic, meaning that the ISP

assigns a different unique number to a computer every time it accesses the Internet.  IP addresses can also be static, whereby the user's ISP assigns the computer a unique IP address, and that same number is used by the user every time the computer accesses the Internet. I also know that Yahoo servers are not located in the District of Columbia; they are located in the State of California. Therefore, Internet communications between persons in the District of Columbia via Yahoo take place in interstate commerce.

      c.    Communication via the Internet can take place through many different mediums like accessing a website or sending and receiving electronic mail, also known and referred to herein as "e-mail."  E-mail is an electronic form of communication which can contain letter-type correspondence and graphic images.  E-mail is similar to conventional paper type mail in that it is addressed from one individual to another.

      d.    E-mail messages usually contain a header that gives the screen name, the identity of the Internet access provider, and the return address on the Internet of the individual who originated the message or graphic.

      e.    The Internet also allows individuals to trade pictures or images, often through e-mail or by downloading images from a website or another individual's computer, as described below.

(1)    Photographs and other images can be stored as data on a computer.  This storage can be accomplished using a "scanner," which is an optical device that can recognize images or characters on paper and convert them to digital form by using specialized software.

(2)    After the photograph or other image has been scanned into the computer, the computer stores the data from the image as an individual "file."  Such a file is generally known as a "GIF" (Graphic Interchange Format) or "JPEG" (for the Joint Photographic Experts Group, which wrote the standard) file, recognizable by the ".gif" or ".jpg" file extensions (hereafter referred to as an "image file").

(3)    Computers are capable of displaying an image file as a facsimile of the original image on a computer screen.

(4)    Using a computer connected to a network connected to the Internet, one can transmit and receive image files between computers located in different states or countries.

(5)    An image file itself can be either a single image (one picture only, also known as a computer file), or a multiple image file (two or more pictures, usually "zipped" or compressed using a commonly available utility and recognizable by the ".zip" file extension).  Multiple image files can also be placed within an executable file (recognizable by the ".exe" file

extension).  When a computer runs the executable file the images can be expanded into several image files.

(6)   A computer's ability to store images in digital form makes the computer an ideal repository for child pornography.  Images can be stored internally in a computer on its "hard drive," and/or externally on "floppy" disks of several sizes and capacities, and/or externally on CDs and/or DVDs of several size and capacities and on other removable media storage devices.  A single floppy disk can store dozens of images and hundreds of pages of text.  A single CD or DVD can store hundreds of images and/or multiple videos or video clips.  The storage capacities of the electronic storage media (hard drives and floppy disks) used in home computers have grown tremendously within the last several years.  Hard drives with the capacity of a hundred gigabytes are common.  These drives can store tens of thousands of images at a very high resolution.  These images can also be stored on the computers of an Internet company hosting the particular website.  A floppy disk is small portable magnetic diskette in a plastic holder used to store information. It is sometimes referred to as "3½ Floppy (A:/)", and is also known as a data storage device connected to a computer either internally or externally. Floppy drives, tape drives and USBs drive all considered storage devices.

(7)  With a modem, a computer user can

transport an image file from the Internet or from another user's computer to his own computer, so that the image file is stored in his computer. The process of transporting an image file to one's own computer is called "downloading." The user can then display the image file on his computer screen, and can "save" or retain the images on his computer for an indefinite time period.

(8) In addition to permanently storing the downloaded image on his computer, the user may print the image file. The finished product can appear as a magazine quality picture to be stored or distributed to other collectors. The original image that was downloaded or transported is maintained in the computer.

(9) With a modem, a computer user can also send an image file that is retained in his computer to another individual or to areas of the Internet where it can be accessed by many other computer users. This process of sending an image file is called "uploading."

(10) The process of "uploading" is similar to the "downloading" process except the user is sending the computer image file to the individual or to the Internet as a whole instead of retrieving the information from another computer.

f. Another well-known component of the Internet is the World Wide Web, or the "Web." The Web is a collection of

websites located or stored on different computers throughout the world.  Each website is identified by a unique Uniform Resource Locator ("URL"), which identifies the server on which the website information is stored.  Users access websites by typing the corresponding URL into their web browser.

## USE OF THE INTERNET AND COMPUTERS FOR CHILD PORNOGRAPHY

10.   Based on my training, experience and conversations with other law enforcement agents, I know that computers, computer technology and the Internet have revolutionized the way in which child pornography is produced, distributed, utilized and collected.  They have revolutionized also the way in which child pornography collectors interact with each other.  Child pornography formerly was produced using cameras and film (either still photography or movies).  The photographs required darkroom facilities and a significant amount of skill in order to develop and reproduce the images.  As a result, there were significant costs involved with the production of pornographic images.  To distribute these images on any scale also required significant resources.  The photographs were somewhat bulky and required secure storage to prevent their exposure to the public.  The distribution of these wares was accomplished through a combination of personal contact, mailings, and telephone calls. Any reimbursement would follow these same paths.

11.    The development of computers and the Internet has added to the methods used by child pornography collectors to interact with and sexually exploit children and to produce and distribute child pornography.  Computers and the Internet generally serve four functions in connection with child pornography.  These are: production, communication, distribution, and storage.

a.    Child pornographers now can produce both still and moving images directly from a common video camera.  The captured images can be edited in very similar ways to a photograph.  The image can be lightened, darkened, cropped, and manipulated in a wide variety of ways.  The producers of child pornography can also use a device known as a scanner to transfer photographs into a computer-readable format.  As a result of this technology, it is relatively inexpensive and technically easy to produce, store and distribute child pornography.  Further, it is more difficult for law enforcement to detect and investigate child pornography produced with this new technology, as opposed to methods used in the past, which required more elaborate and detectable equipment and facilities.

b.    Previously, child pornography collectors had to rely on personal contact, United States mail, and telephonic communications in order to sell, trade or market pornography. The development of computer technology has changed that.  A modem allows any computer to connect to another computer through the

-12-

use of telephone lines.  By connecting to a host computer,
electronic contact can be made to numerous other computers around
the world.  Once this electronic contact is established, there
are numerous outlets and ways that child pornography can be
distributed over the Internet.

c.    Private and/or public Internet relay chat ("IRC")
channels can be and are created for the purpose of sharing child
pornography.  A user can log onto the IRC anonymously and "chat"
and/or trade child pornography with other users, either on an
individual or group basis.  During this type of session no
identifying personal information is obvious or available.  The
only identifiable or traceable information is the individual's IP
address or ISP.  IRC chat rooms are one place where pornographers
meet to trade child related sexual and non-sexual stories and
trade child pornography.  In addition, "chat rooms" on ISPs like
AOL can be and are created for similar purposes.  Both types of
chat rooms are places where children may be at risk of being
"lured."

d.    Aside from the chat rooms that reside on many
service providers' networks, ISPs often allow access to
"newsgroups."  Newsgroups resemble a bulletin board system where
an individual can post messages along with graphic files on a
public forum.  Any item posted in a news group can be retrieved
by any other person who has access to that particular newsgroup.

One commonality between a newsgroup posting and e-mail is that they each often contain a message "header" that gives information about the account that originated a particular message and/or graphic files, and the return address to respond to the poster/sender.

e.    Internet websites also can be used to facilitate the exchange of child pornography.  A website can house child pornography directly, allowing users who access the website to view and download those images.  A website can also house an "Egroup," which is a forum by which persons with shared interests in child pornography can interact in relative privacy. Typically, most Egroups will have a moderator, and membership in the group can be open or by invitation only.  The members of an Egroup also typically communicate with each other by sending an e-mail to the group, which is disseminated to all of the members. In addition, each Egroup typically has a web page that the group's members can visit to view archived postings.  E-mail messages and postings might include files that contain visual depictions and digital video clips.

f.    These communication structures are ideal for the child pornography collector.  The open and anonymous communication allows the user to locate others of similar inclination and still maintain anonymity.  Once contact has been established, it is possible to send text messages and graphic

images to others.  Moreover, the child pornography collector need not use the large service providers.  Child pornography collectors can use standard Internet connections, such as those provided by businesses, universities, and government agencies, to communicate with each other and to distribute pornography.  These communication links allow contacts around the world as easily as calling next door.  Additionally, these communications can be quick, relatively secure, and as anonymous as desired.  All of these advantages are well known and are the foundation of transactions between child pornography collectors.

     g.   The ability to produce child pornography easily, reproduce it inexpensively, and market it anonymously (through electronic communications) has drastically changed the method of distribution of child pornography.  For example, child pornography can be transferred (via electronic mail, through file transfer protocols("FTPs")[1] , or via newsgroup postings) to anyone with access to a computer and modem.  Because of the proliferation of commercial services that provide electronic mail service, chat services, and easy access to the Internet, the computer is a preferred method of distribution of child pornographic materials.

---

     [1]    An FTP is a protocol that defines how to transfer files from one computer to another.  One use, known as "anonymous FTP," allows users who do not have a login name or password to access certain files from another computer, and copy those files to their own computer.

h.    The computer's capability to store images in
digital form makes it an ideal repository for pornography.  A
single floppy disk can store dozens of images and hundreds of
pages of text.  The size of the electronic storage media
(commonly referred to as a hard drive) used in home computers has
grown tremendously within the last several years.  Hard drives
with the capacity of 100 gigabytes are not uncommon.  These
drives can store thousands of images at very high resolution.
Further, magnetic storage located in host computers allows child
pornographers to hide pornographic images from law enforcement.
It is possible to use a video camera to capture an image, process
that image in a computer with a video capture board, and to save
that image to storage on a host computer in another country.
Only careful laboratory examination of electronic storage devices
can recreate the evidence trail.

## CHILD PORNOGRAPHY COLLECTOR CHARACTERISTICS

12.  Based on my training and experience and conversations
that I have had with other federal agents and law enforcement
officers, I know that child pornography is not readily available
in retail establishments.  Accordingly, individuals who wish to
obtain child pornography do so usually by ordering it from abroad
or by discreet contact, including through the use of the
Internet, with other individuals who have it available or by
accessing web sites containing child pornography.  Child

pornography collectors often send and receive electronic mail conversing with other collectors in order to solicit and receive child pornography.

13.   I know that child pornography collectors usually maintain and possess their materials (computer images, pictures, films, magazines, videotapes, correspondence, source information, etc.) in a private secure location such as their home, office, or work space.  Images or videos taken off of the Internet are often stored in the hard drive of the computer or on diskettes kept in private locations near the computer such as in locked desks, shelves, contiguous work space, filing cabinets or similar items and areas in office space.  These images also can be printed on computer printers and maintained by child pornography collectors in paper form.  Additionally, child pornography collectors often transfer those images to videotape, either by videotaping with a handheld video camera the images or videos on a computer screen, or by connecting a video cassette recorder to the computer and recording the images or videos directly.

14.   Collectors of child pornography typically retain their materials and related information for many years.  Most collectors of child pornography seek to increase the size of their collections in a manner similar to collectors of coins, stamps, or rare books.  Many retain these materials, including information regarding sources, for their entire adult lives.

Moreover, individuals who distribute and/or collect child pornography generally prefer not to be without their child pornography for any prolonged time period.  This behavior has been documented by law enforcement officers involved in the investigation of child pornography throughout the world.  In addition, collectors of child pornography rarely destroy correspondence from other collectors or distributors unless their activities are uncovered by law enforcement authorities or others.

15.  Even if a collector of child pornography images attempts to delete images from his computer, however, for example, by moving them to the "Recycle Bin" of a computer, those images usually remain intact on the hard drive of a computer, often for a long period of time, because information on a hard drive is not destroyed until it is physically overwritten with other data or erased from the hard drive.  As a result, even when a computer user thinks he or she has deleted data, in reality it usually remains on the computer and is recoverable.

16.  Accordingly, information in support of probable cause in child pornography cases is less likely to be stale because collectors and traders of child pornography are known to store and retain their collections for extended periods of time, usually in their home.  Indeed, as noted above, based on my experience with child pornography search warrants, I know that

even where information about a suspect's use of child pornography is not current, we typically find child pornography at the location of the search, assuming the suspect still resides there.

17.  Additionally, based on my experience and training, I know that persons who collect and distribute child pornography:

a.  Frequently collect sexually explicit materials in a variety of media, such as photographs, magazines, motion pictures, video tapes, books, slides and/or drawings or other visual media that they use for their own sexual arousal and gratification.  Further, they commonly use this type of sexually explicit material to lower the inhibitions of children they are attempting to seduce, to arouse the selected child partner, and to demonstrate the desired sexual acts.

b.  Frequently receive sexual gratification, stimulation, and satisfaction from actual physical contact with children and/or from fantasies they may have viewing children engaged in sexual activity or in sexually suggestive poses (in person, in photographs, or other visual media) or from literature describing such activity.

c.  Often correspond and/or meet others to share information and materials, rarely destroy correspondence from other child pornography distributors/collectors, conceal such correspondence as they do their sexually explicit material, and often maintain lists of names, addresses, telephone numbers and

screen names of individuals with whom they have been in contact and who share the same interests in child pornography.

18.  Based on my training and experience and my conversations with law enforcement agents, I have also learned that:

a.  Child pornography is a permanent record of the sexual abuse of a child victim.  Each time child pornography is reproduced, downloaded, or forwarded by an Internet user, the victimization of the minor appearing in the pornography is perpetuated.  Such items also are important evidence and indications of an individual whose sexual objects are children, and of that individual's motive, intent, and predisposition to violate federal law related to the production, possession and distribution of child pornography.  Additionally, these items lead to the identification of child victims and other individuals engaging in similar conduct.

b.  Child pornography collectors reinforce their fantasies, often by taking progressive, overt steps aimed at turning the fantasy into reality in some or all of the following ways:  collecting and organizing their child-related material; masturbating while viewing the child pornography; engaging children, online and elsewhere, in conversations, sometimes sexually explicit conversations, to fuel and fortify the fantasy; interacting, both directly and indirectly, with other like-minded

adults through membership in organizations catering to their
sexual preference for children thereby providing a sense of
acceptance and validation within a community; gravitating to
employment, activities and/or relationships which provide access
or proximity to children; and frequently persisting in the
criminal conduct even when they have reason to believe the
conduct has come to the attention of law enforcement.  These are
need-driven behaviors to which the offender is willing to devote
considerable time, money, and energy in spite of risks and
against self interest.  The "collection" is the best indicator
that law enforcement has of what the collector *wants* to do, not
necessarily what he has done or will do.  The overriding
motivation for the collection of child pornography may be to
define, fuel, and validate the collectors' most cherished sexual
fantasies involving children.

### THE INVESTIGATION AND THE SUBJECT WORKSPACE

19.  For the reasons set forth below, there is probable
cause to believe that evidence of the possession of child
pornography will be located at the WORKSPACE.

20.  When users sign onto the Library of Congress
(LOC)computers the following banner appears: "This is notice that
the use of the Library's computers, terminals and associated
systems for e-mail and internet access are intended for employees
to assist in accomplishing their work.  Such usage may be

monitored or scrutinized by the Library of Congress and
inappropriate usage may result in limitation or revocation of
usage and/or may subject the employee to administrative or
criminal penalties."  This banner appears each time an employee
logs onto an LOC computer.

21.  As part of an ongoing investigation into possible
inappropriate or illegal use LOC ccomputers, your affiant
identified an LOC computer accessing child pornography websites
through google groups.

22.  On July 9, 2007, your affiant met with representatives
from the National Center for Missing and Exploited Children
(NCMEC)and obtained child pornography search terms used to detect
criminal activity relating to the possession and distribution of
child pornography on the internet.  The terms provided by NCMEC
were entered into a filter located on LOC servers and designed to
track and log outgoing internet activity.

23.  One of the terms provided by NCMEC as a term commonly
used in the child pornography industry is "twinks."  On September
19, 2007, the term "twinks" was detected on the IP address
140.147.143.82 assigned to user profile "MMATHERON".  Further
investigation showed that the person using user profile
"MMATHERON" routinely accessed child pornographic "internet
groups" through Yahoo and Google to include "Crazy For Twink
Butts," "Endless-Twinks-n-Things" and "Gayscat."  Investigation

also revealed that "MMATHERON" has the capability to receive
emails and other Yahoo data via his cellular telephone.

24.    Investigation revealed that Michael John Matheron is an
employee at the LOC as a Congressional Research Specialist in the
American Law Division.  Further investigation revealed the LOC
computer associated with IP address: 140.147.143.82 is assigned
to Matheron, and is located in Matheron's personal workspace.

25.    During the course of this investigation, LOC OIG
Special Agents were able to see evidence of Matheron accessing
google groups and his Yahoo accounts, which he used to save and
upload images of child pornography.  Further investigation
revealed that Matheron uses at least one external device to
upload images to his Yahoo account (login
mfb1949_20901@yahoo.com).

26.    LOC OIG Special Agents  were able to view samples of
the images located and saved on Matheron's Yahoo account.  On
December 7, 2007, your affiant analyzed the pictures available
and confirmed that the pictures consist of images of naked young
boys engaging in sexual activity. Further investigation revealed
that Matheron has remarried and currently lives with his new wife
and a 13 year old stepson. There is also evidence that Matheron
has been visiting adoption websites and researching one-time use
digital camcorder devices.

## REQUEST TO SEARCH THE WORKSPACE

27.  In light of the foregoing information, and based on my experience and training, I submit that there is probable cause to believe that the WORKSPACE contains child pornography or other evidence concerning violations of Title 18, United States Code, Section 2252A, and that the fruits and instrumentalities of those violations can be found at the WORKSPACE.  Specifically, any data storage devices such as diskettes, thumb drives and other devices upon which child pornography can be stored at the WORKSPACE are likely to be the primary means of possessing and collecting child pornography and therefore may be seized "as the means of committing [the] criminal offense" pursuant to Federal Rule of Criminal Procedure 41(b)(3).  The evidence, fruits, and instrumentalities of the offenses include the items described in Attachment A, attached.

## METHODS TO BE USED TO SEIZE AND SEARCH COMPUTER-RELATED EQUIPMENT IN THE WORKSPACE

29.  Based upon my training, experience, and information related to me by agents and others involved in the forensic examination of computers and other electronic media, I know that electronic data can be stored on a variety of systems and storage devices including hard disk drives, floppy disks, compact disks, magnetic tapes, and memory chips.  I also know that searching computerized information for evidence or instrumentalities of a crime commonly requires agents to seize most or all of a computer

system's input/output peripheral devices, related software documentation, and data security devices (including passwords), and external storage devices so that a qualified computer expert can accurately retrieve data from the system or phone in a laboratory or other controlled environment.  This is true for the following reasons:

a.    Searching computer systems is a highly technical process which requires specific expertise and specialized equipment.  There are so many types of computer hardware and software in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search.  In addition, it may also be necessary to consult with computer personnel who have specific expertise in the type of storage device that is being searched.

b.    Searching computer systems requires the use of precise, scientific procedures which are designed to maintain the integrity of the evidence and to recover "hidden," erased, compressed, encrypted, or password-protected data.  Computer hardware and storage devices may contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Since computer data is particularly vulnerable to inadvertent or intentional modification or destruction, a controlled environment, such as a law enforcement laboratory, is essential to conducting a complete and accurate analysis of the

-25-

equipment and storage devices from which the data will be extracted.

      c.    The volume of data stored on many computer systems and storage devices will typically be so large that it will be highly impractical to search for data during the execution of the physical search of the WORKSPACE. A single megabyte of storage space is the equivalent of 500 double-spaced pages of text. A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text. Storage devices capable of storing up to 100 gigabytes of data are now commonplace in desktop computers.

      d.    Computer users can attempt to conceal data within computer equipment and storage devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text. Computer users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. In addition, computer users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography a computer user can conceal text in an image file which cannot be viewed when the image file is opened. Therefore,

-26-

a substantial amount of time is necessary to extract and sort through data that is concealed or encrypted to determine whether it is evidence, contraband, or instrumentalities of a crime.

30. In searching for data capable of being read, stored, or interpreted by a computer, law enforcement personnel executing the applicable Search Warrant will employ the following procedure:

a. Upon securing the WORKSPACE, law enforcement personnel trained in searching and seizing computer data (the "computer personnel") will search and seize any storage devices and transport these items to an appropriate law enforcement laboratory for review as to whether these items contain contraband. Because of the lengthy period of time necessary to perform a complete search of all material contained in any storage devices, it would not be feasible to conduct this search at the WORKSPACE, and seizure is necessary so that the preservation of data is not jeopardized. The storage devices will be reviewed by appropriately trained personnel in order to extract and seize any data that falls within the list of items to be seized set forth herein.

b. If upon the search of the storage devices it is determined that the storage devices do not contain contraband, an instrumentality of the offense, a fruit of the criminal activity, or evidence of the offense specified above, then the computer personnel will return the storage devices to the WORKSPACE.

c.   The analysis of electronically stored data may entail any or all of several different techniques.  Such techniques may include, but shall not be limited to, surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files); "opening" or reading the first few "pages" of such files in order to determine their precise contents; "scanning" storage areas to discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden files; and performing electronic "key-word" searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are related to the subject matter of the investigation.

31.  Any data that is encrypted and unreadable will not be returned unless law enforcement personnel have determined that the data is not (i) an instrumentality of the offense, (ii) a fruit of the criminal activity, (iii) contraband, (iv) otherwise unlawfully possessed, or (v) evidence of the offense specified above.

32.  In searching the data, the computer personnel may examine all of the data contained in the storage devices to view their precise contents and determine whether the data falls within the items to be seized as set forth herein.  In addition, the computer personnel may search for and attempt to recover

"deleted," "hidden," or encrypted data to determine whether the data falls within the list of items to be seized as set forth in this affidavit.

33.  If the computer personnel determine that the storage devices are no longer necessary to retrieve and preserve the data, and the items are not subject to seizure pursuant to Federal Rule of Criminal Procedure 41(b), the Government will return these items.

34.  In order to search for data from storage devices, law enforcement personnel will need to seize and search the following items, subject to the procedures set forth above:

    a.  any storage device capable of being used to commit, further or store evidence of the offense listed above;

    b.  any computer equipment used to facilitate the transmission, creation, display, encoding or storage of data, including word processing equipment, modems, docking stations, monitors, printers, plotters, encryption devices, and optical scanners;

    c.  any magnetic, electronic, or optical storage device capable of storing data, such as floppy disks, hard disks, tapes, CD-ROMs, CD-R, CD-RWs, DVDs, optical disks, printer or memory buffers, smart cards, PC cards, memory calculators, electronic dialers, electronic notebooks, personal digital assistants, cameras, and videocameras;

d.    any documentation, operating logs, and reference manuals regarding the operation of the computer equipment, storage devices, or software;

e.    any applications, utility programs, compilers, interpreters, and other software used to facilitate direct or indirect communication with the computer hardware, storage devices, or data to be searched;

f.    any physical keys, encryption devices, dongles, and similar physical items that are necessary to gain access to the computer equipment, storage devices, or data; and

g.    any passwords, password files, test keys, encryption codes, or other information necessary to access the computer equipment, storage devices, or data.

35.    In addition, law enforcement personnel will need to seize and search any device that can capture or store a photographic or video image.

## **CONCLUSION**

36.   Based on the aforementioned factual information, your affiant respectfully submits that there is probable cause to believe that MICHAEL J. MATHERON has  violated Title 18, United States Code, Section 2252A, and that MICHAEL J. MATHERON maintains child pornography inside of the WORKSPACE described herein to do so.

37.   Given the propensity of child pornography collectors to maintain and increase the number of images in their collections, your affiant believes that evidence, fruits and instrumentalities of violations of Title 18, United States Code, Section 2252A(a)(1)and (a)(5), listed in Attachment A to this Affidavit, which is incorporated herein by reference, are concealed at the WORKSPACE.   Rule 41 of the Federal Rules of Criminal Procedure authorizes the government to seize and retain evidence and instrumentalities of a crime for a reasonable time, and to examine, analyze, and test them.

38.   Based upon my knowledge, training and experience, and consultations with law enforcement experts, I know that searching and seizing information from electronic storage devices often requires agents to seize most or all electronic storage devices (along with related peripherals) to be searched later by a qualified computer expert in a laboratory or other controlled environment.

39.  Your affiant, therefore, respectfully requests that the attached warrants be issued authorizing the search and seizure of the items listed in Attachment A.

_____          _____
                                 SPECIAL AGENT DONYA JACKSON
                                 LIBRARY OF CONGRESS
                                 OFFICE OF THE INSPECTOR GENERAL


Sworn and subscribed before me
this ____     day of December, 2007


_____
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

1.    Records, documents, and materials, including but not limited to: cell phones, tapes, cassettes, cartridges, streaming tape, commercial software and hardware, computer disks, disk drives, modems, tape drives, disk application programs, data disks, system disk operating systems, magnetic media floppy disks, hardware and software operating manuals, tape systems, digital cameras, video cameras, scanners in addition to computer photographs, Graphic Interchange formats and/or photographs, undeveloped photographic film, slides, and other visual depictions of such Graphic Interchange formats (including, but not limited to, JPG, GIF, TIF, AVI, RM and MPEG), and the data within the aforesaid objects relating to said materials, which may be, or are, used to:  visually depict child pornography; contain information pertaining to the interest in child pornography, or sexual activity with children; and/or distribute, receive, or possess child pornography, or information pertaining to an interest in child pornography.

2.    Originals and copies of photographs, negatives, magazines, motion pictures, video tapes, books, slides, audiotapes, handwritten notes, drawings and/or other visual media that depict what appears to be a minor engaged in sexually explicit conduct.

3.    Materials and photographs depicting sexually explicit conduct with what appear to be minors, including material that may assist in the identification and location of such minors.

4.    Records evidencing ownership and/or use of computer equipment found in the Workspace described above.

5.    Records which evidence membership with any website or chat room or organizations related to child pornography, including without limitation, e-mail, correspondence and envelopes, passwords, credit card bills or receipts, and URL addresses.

**ATTACHMENT B**

The workspace to be searched is the workspace of Michael J. Matheron located in the Library of Congress, 101 Independence Avenue, SE, Washington, DC, James Madison Building, 2nd floor, room 227, which has three walls, an open doorway, and light brown carpet.  Within the three walls is a desk, a red chair, bookshelves, and a file cabinet.  On the file cabinet is a  name placard reading Michael J. Matheron. ("WORKSPACE").  There is a rattan screen which is sometimes blocking the open doorway.